T.C. Memo. 2011-191

UNITED STATES TAX COURT

WILLIAM AND NANCY HARNETT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29806-07.                    Filed August 11, 2011.

<u>Philip G. Panitz</u>, for petitioners.

<u>Kelly R. Morrison-Lee</u>, <u>William J. Gregg</u>, and <u>Scott A. Hovey</u>,
for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Respondent determined these deficiencies
in petitioners' Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 2003 | $234,610 |
| 2004 | 207,595 |
| 2005 | 197,331 |

After concessions by petitioners,[1] the primary issue for decision is whether losses from petitioners' real estate activities constitute losses from passive activities pursuant to section 469.[2]

## FINDINGS OF FACT

The parties have stipulated some facts, which we find accordingly. When they petitioned the Court, petitioners resided in Florida.

## I. Petitioner's Background

After retiring from the U.S. Marine Corps in 1952, William Harnett (petitioner) became a real estate agent. In 1965 he organized Washington Homes, Inc., a real estate development company of which he was sole shareholder until he took the company public in 1972. In 1988 an unrelated entity purchased Washington Homes, Inc., for approximately $100 million.

In the meantime, to provide financing for customers of Washington Homes, Inc., petitioner had created Bay State Savings

---

[1]In the stipulation of settled issues, petitioners concede a $10,163 adjustment for interest income, a $17,458 adjustment for dividend income, and a $10,163 adjustment for investment interest expense for 2003 as determined in the notice of deficiency. On brief petitioners further concede the claimed flowthrough rental losses with respect to two condominiums at 1455 Ocean Drive, Miami, Florida, of $65,823 for 2003, $57,067 for 2004, and $62,169 for 2005.

[2]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) as in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure. All figures are rounded to the nearest dollar.

& Loan, later renamed Washington Savings Bank (bank), in Bowie, Maryland. During the years at issue petitioner owned about 47 percent of the bank's common stock and was the bank's highest paid employee. During 2003, 2004, and 2005 he received $338,614, $337,837, and $273,850, respectively, in wages from the bank and $389,129, $609,634, and $164,030, respectively, in ordinary dividend income from the bank.

From 1988 through the years at issue and beyond, petitioner was chairman of the board at the bank. In that capacity he would preside over monthly meetings of the bank's board of directors to review information provided by the bank's staff, discuss potential courses of action, and resolve issues listed on a formal agenda. Petitioner was also the bank's chief executive officer (CEO) from 1988 until he resigned that position in February 2005, becoming a paid consultant for the bank. As CEO petitioner was responsible for attaining the bank's financial performance goals, ensuring that the bank's operations were sound, evaluating the bank's financial condition, carrying out the bank's policies and procedures, presiding over all board meetings, and reviewing and signing all financial and government filings; he also had other companywide management responsibilities.

In 2003, at the age of 72, petitioner suffered a heart attack. He also had other health problems that curtailed the

time he spent at the bank.  Nevertheless, throughout the years at issue he maintained an office at the bank and remained active in his duties there.  In addition to coming to the bank periodically, he spent additional time at remote locations tending to bank business via telephone and fax, preparing for bank meetings, and reviewing reports.

II.  Petitioner's Real Estate Activities

Before the years at issue petitioner had acquired a great deal of real estate (described in more detail below) which he owned either directly or through his wholly owned S corporation, Washington Capital Group, Inc. (the S corporation).  At one time petitioner had rented out many of these properties.  But by 2003, because of his age and other conditions, he had mostly stopped renting these properties and had begun trying to sell them.

During the years at issue Jeana Hopkins, who was formerly petitioner's secretary at the bank, served as bookkeeper for his real estate activities and handled payments and some correspondence related to those activities.  As discussed in more detail below, petitioner's nephew, Robert Goldie, looked after several of the Pennsylvania properties.  Petitioner's wife was also involved in managing some of the properties in Florida and Pennsylvania.

During the years at issue (or some portion of them) petitioner owned the following properties either individually, jointly with his wife, or through his S corporation.[3]

A.  The Pennsylvania Properties

1.  116 and 118 East North Avenue, Allison Park, Pennsylvania

In 1957 petitioners purchased these two houses, which were in what petitioner describes as a "poor neighborhood".  For about 45 years petitioner rented these houses to various charitable organizations as a daycare center.  He stopped renting these properties in 2002 after the last tenant went bankrupt and vacated the premises, leaving them in poor condition.  Petitioner hired a lawyer to sue the former tenant.  In 2003 he also hired Robert Goldie to make repairs to the properties.  In 2004 petitioner sold these properties.

2.  1620 Golden Mile Highway, Monroeville, Pennsylvania

This property included an 8,000-square-foot structure known as the Monroeville Professional Center.  The principal tenant, an architectural firm, stayed there for over 33 years but vacated the property at some unspecified time before the years at issue.

---

[3]In addition, before the years at issue petitioner had owned an interest in a single-family home in La Plata, Maryland.  He owned this interest through a partnership, WHI Associates, of which he was general partner and 75-percent owner.  The partnership sold this property at some unspecified time before the years at issue.

On February 13, 2003, petitioner entered into a listing agreement with a local real estate agent.  Petitioner touched base with the real estate agent every couple of weeks to discuss the progress of the listing and to discuss potential buyers.  After the agent showed the property to a potential buyer, he would call petitioner to discuss it.  Petitioner was the agent's only contact regarding the potential sale of this property.  Petitioner canceled the listing after 6 months.  In 2005 petitioner received an offer to purchase the property that was contingent upon having the property rezoned for use as a methadone clinic.  In July 2005 petitioner engaged a Pittsburgh, Pennsylvania, law firm in connection with the rezoning.  Ultimately, the rezoning was not approved, and the property was not sold.

### 3.  303 Forestwood Drive, Gibsonia, Pennsylvania

This property was a single-family home that petitioner had once rented out.  After the last tenant moved out in 2002, leaving the property in poor condition, petitioner did not attempt to rent it.  He retained a real estate broker to attempt to sell it.

### 4.  516 Edgehill Drive, Gibsonia, Pennsylvania

This property was a single-family home that petitioners purchased in 1956.  They rented it out for many years, but after the last tenant moved out in 2001 or 2002, they did not attempt

to rent it.  In September 2004 petitioner and a local real estate agent negotiated and entered into a listing agreement to sell the property.  The agent found a buyer for the property; petitioner instructed the agent to counter the buyer's offer.  In October 2005 a sales agreement was delivered to petitioner.  Petitioner paid to have certain repairs done to the property and discussed with his agent the resolution of a tax issue relating to the property.  Escrow closed in November 2005.  The real estate agent signed the settlement documents on petitioner's behalf.

### 5.  Kim Brett Drive, Allison Park, Pennsylvania

This was vacant land which petitioner subdivided in 2003. During the years at issue petitioner received calls from various individuals interested in purchasing lots, but he made no sales.

### 6.  Laurel Lane, Allison Park, Pennsylvania

This was also vacant land.  In 2004 petitioner received inquiries from builders about selling this land for cluster-home development, but petitioner declined to pursue these discussions because he did not wish to have that type of development there.

### B.  Petitioner's Miami, Florida, Properties

### 1.  770 N.E. 69th Street, Miami, Florida

This property was a one-bedroom condominium in the Palm Bay Club.  Petitioners purchased the condominium in 1970. Petitioner had rented this property out many times, but the last tenant left at some unspecified time before 2003 because of a

termite infestation. During the years at issue petitioners had a dispute with the Palm Bay Club condominium association regarding condominium fees. Jeana Hopkins handled the correspondence for petitioners in this matter. In October 2004 petitioners sold this property through a broker.

### 2. 15511 Fisher Island Drive, Miami, Florida

This property was a condominium overlooking the ocean at Fisher Island, where petitioners also had a personal residence. Although this property previously had been used for vacation or weekend rentals, petitioner testified that he had no tenant in this property in 2003 and that during the years at issue "I didn't attempt to rent it." It appears, however, that petitioner's wife rented the property for relatively short periods in 2003 and 2004 and that petitioners' children also used the property.[4] In 2005 petitioner attempted to sell the property but had no offers.

### 3. 1455 Ocean Drive, Miami, Florida

Through his S corporation petitioner owned two units in a high-rise condominium building at this address.[5] He bought these

---

[4]A letter in evidence, dated July 30, 2004, to petitioner from his wife indicates that "The children and guest stay in the villa" and that she had rented this property "for two months so far as well as last season for two months." The letter also states that the property was unavailable for rent in 2002 because of refurbishment activity.

[5]Petitioner testified at length that he owned one of these
(continued...)

units new in 1998 and never rented them.  In November 2004 he listed one of the units with a realtor.  A purchaser for one of the units was found at the end of 2005; the sale closed in 2006.

### C.  Batts Neck Plantation

This property is on Kent Island in Stevensville, Maryland, about 30 miles from the bank.  Petitioner acquired this property in 1990 at a foreclosure auction and owned it through his S corporation.  During the years at issue petitioner also owned three vacant lots which abutted Batts Neck Plantation.

Before petitioner acquired it, Batts Neck Plantation had been a hunting lodge.  It covers hundreds of acres of farmland along the Chesapeake Bay and has three residential structures:  A main house built in the 1930s; a barn that has been converted into guest quarters; and an old caretaker's house.  Insofar as the record shows, petitioners never rented out the main house or the barn at any time before or during the years at issue.  During the years at issue petitioner frequently stayed at Batts Neck Plantation and received mail and business communications there.

The caretaker's house at Batt's Neck Plantation is a three-bedroom, two-bath farmhouse with a detached garage.  During the

---

[5](...continued)
units individually and one through his S corporation, but petitioners stipulated that both units were owned by petitioner's S corporation.  Petitioner appears to have reported losses from both condominiums on his S corporation's return.

years at issue the ex-wife of the former caretaker lived in the house with her son, paying $900 monthly rent.

In September 2003 Batts Neck Plantation sustained damage from Hurricane Isabel, and about a year later it sustained damage from Hurricane Ivan. These damages necessitated significant cleanup and repairs. During the years at issue petitioner through his S corporation spent substantial sums on property maintenance, upkeep, and utility bills for Batts Neck Plantation.

D. Washington Harbour Condominiums

During the years at issue petitioner owned three adjacent condominium units (206, 207, and 208) in the Washington Harbour Condominiums (Washington Harbour) in Washington, D.C.[6] These three large units form a separate wing within Washington Harbour and share a terrace overlooking the Potomac River.

Petitioner acquired unit 206 in 1986 and initially lived there. Around 1995 he acquired units 207 and 208. Between about 1996 and 1999 he rented unit 206 to various tenants. He never rented unit 207 or 208. Sometimes petitioner would stay in unit 207 or 208 when unit 206 was rented or occupied.

Around 2003 petitioner began to experience significant water damage from leaks in his Washington Harbour units. About this same time petitioner became embroiled in a dispute with

---

[6]Petitioner owned unit 206 in his own name and units 207 and 208 in the name of his S corporation.

Washington Harbour about his parking spaces. These disputes led to litigation between petitioner and the Washington Harbour Condominium Owners Association. Petitioner hired three attorneys to represent him in this litigation, which continued throughout the years at issue and beyond.

III. Petitioners' Tax Returns

On their joint Federal income tax returns for 2003, 2004, and 2005, petitioners reported taxable income from wages, interest, dividends, pensions and annuities, and Social Security of $1,230,170, $1,549,918, and $1,214,770, respectively. Partially offsetting this income, they claimed sizable losses from real estate activities. More particularly, on Schedules C, Profit or Loss From Business, with respect to the properties that petitioners held directly they reported nonpassive losses of $265,514, $263,170, and $253,028 for 2003, 2004, and 2005, respectively. Additionally, on Schedules E, Supplemental Income and Loss, with respect to the properties that the S corporation held, they reported nonpassive flowthrough losses of $459,889, $567,942, and $486,309, for 2003, 2004, and 2005, respectively.

In the notice of deficiency respondent recharacterized all the claimed losses as passive losses from rental activities.

Pursuant to section 469 respondent disallowed most of these losses.[7]

OPINION

## I. The Parties' Contentions

Respondent's primary position, as reflected in the notice of deficiency, is that the losses at issue are subject to the section 469 limitations because they are attributable to rental activities.[8] Petitioners do not contest that most of the losses at issue are attributable to rental activities.[9] But petitioners

---

[7]Respondent allowed these losses to the extent of net passive income, including from sales of business property, as reported on Schedule E.

[8]After trial respondent amended his answer to assert, alternatively, that pursuant to sec. 212(2) petitioners' claimed deductions are limited as relating to investment properties and that pursuant to sec. 280A petitioners' personal use of the Washington Harbour condominiums and Batts Neck Plantation precludes the deduction of any expenses relating to these properties. Respondent acknowledges that he has the burden of proof on these new issues. See Rule 142(a)(1). On brief respondent states that if the Court upholds the notice of deficiency, it is unnecessary for the Court to address these alternative positions. Because we uphold the notice of deficiency, we do not further address respondent's alternative positions.

[9]As indicated in our findings of fact, during the years at issue petitioners actually engaged in very little rental activity with respect to any of their properties, although they had rented some of these properties in earlier years. Nevertheless, with limited exceptions discussed below, petitioners do not dispute respondent's primary position that the losses at issue emanated from rental activities with respect to these properties. To the contrary, while acknowledging that by 2003 petitioner had "grown old and tired of the upkeep required for his properties", they contend that during the years at issue, as in previous years, his
(continued...)

contend that the losses are not from per se passive activities because petitioner was a real estate professional who spent more than 750 hours for each year at issue performing services in real property trades or businesses in which he materially participated.[10]

II.  Burden of Proof

The taxpayer generally bears the burden of proving that the Commissioner's determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In particular, the taxpayer bears the burden of substantiating the amount and purpose of each item claimed as a deduction.  See Higbee v. Commissioner, 116 T.C. 438, 440 (2001); Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Petitioners contend that pursuant to section 7491(a) the burden has shifted to respondent to prove that petitioner was not a real estate professional.  If in any court proceeding a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's proper tax

---

[9](...continued)
primary purpose in holding the properties was "for rental" notwithstanding that he was looking ultimately to liquidate the properties.  Because petitioners agree with respondent's primary position that the losses in question emanate from rental activities, we assume without deciding that this is the case.

[10]Petitioners do not contend that Nancy Harnett was a real estate professional.

liability, and if certain other requirements are met, the Commissioner shall have the burden of proof with respect to that issue. Sec. 7491(a)(1). Credible evidence is evidence the Court would find sufficient upon which to base a decision on the issue in the taxpayer's favor, absent any contrary evidence. See Higbee v. Commissioner, supra at 442. Section 7491(a)(1) applies, however, only if the taxpayer complies with all substantiation and recordkeeping requirements under the Code and cooperates with the Commissioner's reasonable requests for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(A) and (B).

As explained below, our decision turns primarily on whether petitioner performed more than 750 hours of services during each year at issue in real property trades or businesses. Attempting to meet this requirement, petitioners rely heavily on petitioner's testimony which, as described in more detail below, we find to be vague, exaggerated, and unsupported or contradicted by other evidence that petitioners have offered. Petitioners have failed to present credible evidence sufficient to establish that petitioner meets the 750-hour requirement. Whether this be viewed as failure to satisfy the substantiation prerequisite of section 7491(a)(2)(A) or as failure to present credible evidence sufficient for the Court to render a decision in petitioners'

favor, the result is the same--the burden of proof remains with petitioners.  See <u>Dunn v. Commissioner</u>, T.C. Memo. 2010-198.

III.  <u>Passive Activity Loss Rules</u>

Section 469(a)(1) limits the deductibility of losses from certain passive activities of individual taxpayers and certain other entities.  Disallowed passive losses generally may be carried over to the next year.  Sec. 469(b).  Generally, a passive activity is a trade or business in which the taxpayer does not materially participate.  Sec. 469(c)(1)(B).  Material participation is defined generally as regular, continuous, and substantial involvement in the business operations.  Sec. 469(h).

Generally, rental activities are per se passive activities, whether or not the taxpayer materially participates.  Sec. 469(c)(2).  As an exception to this general rule, the rental activities of taxpayers in real property trades or businesses (real estate professionals) are not treated as per se passive activities but rather as trade or business activities, subject to the material participation requirements of section 469(c)(1).  Sec. 469(c)(7); see also sec. 1.469-9(e)(1), Income Tax Regs.  Under section 469(c)(7)(B) a taxpayer is a real estate professional if:

> (i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and

(ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

In the case of a joint return, these requirements are met if, and only if, either spouse separately satisfies them. All of a taxpayer's real estate activities are taken into account to determine whether the 750-hour requirement is satisfied. See Fowler v. Commissioner, T.C. Memo. 2002-223; Bailey v. Commissioner, T.C. Memo. 2001-296.

The regulations set forth these requirements for establishing a taxpayer's hours of participation:

> The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries. [Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).]

The regulations do not allow a postevent "ballpark guesstimate". Moss v. Commissioner, 135 T.C. 365, 369 (2010).

IV. Analysis of Petitioner's Claimed Hours of Participation

Petitioner did not maintain a contemporaneous log of time spent participating in his real estate activities. In 2008, in preparation for respondent's audit, he attempted to reconstruct the time he spent in his real estate activities. He claims to

have spent months going through his records to arrive at these reconstructed estimates, but petitioners have not demonstrated the evidentiary basis or methodology for these reconstructions. At trial petitioner testified that on the basis of these reconstructions he estimated spending 1,270 hours managing his real estate properties in 2003, 1,421 hours in 2004, and 1,648 hours in 2005. As discussed in more detail below, the contemporaneous records that petitioners have offered into evidence do not credibly support these estimates.

    A.  The Pennsylvania Properties

    Petitioner claims to have spent hundreds of hours each year performing services with respect to his Pennsylvania properties. For the reasons described below, we do not find these claims convincing, especially considering that for several of these properties, it appears to have been petitioner's nephew, Robert Goldie, who generally checked on the properties; cleaned, maintained, and repaired them; met with contractors; and marketed the properties to potential renters or purchasers. Petitioner did not mention Robert Goldie's involvement in these properties at trial other than, perhaps, by referring vaguely to "contractors". Petitioner testified vaguely that he visited his Pennsylvania properties "many times" during the years at issue, but his calendar, which is in evidence, contains no indication that he traveled to Pennsylvania during these years, although it

does indicate that during these years he frequently attended to bank business and had many social engagements and medical appointments in the Washington, D.C., area.

###### 1. 116 and 118 East North Avenue, Allison Park, Pennsylvania

Petitioner testified that he spent 134 hours in 2003 and 111 hours in 2004 with respect to these properties.  He testified that he met with various contractors and "worked right beside them" on these properties.  The only invoices from contractors in the record, however, are from Robert Goldie and a heating contractor, and Robert Goldie billed petitioner for meeting with the heating contractor.  By way of example, in September 2003 Robert Goldie billed petitioner for over 200 hours of labor over the course of several months.

Petitioner testified that he advertised this property by putting up signs and that he met with "countless numbers" of potential renters or buyers.  Invoices indicate, however, that Robert Goldie installed a sign on the property, showed the property to potential renters or buyers, and acted as a contact between petitioner and the buyer on at least one occasion. Although petitioner testified that he personally cleaned up the property and dug out debris, Robert Goldie billed petitioner for cleaning inside the property and cleaning garbage, debris, and weeds from outside the building.

2.  <u>1620 Golden Mile Highway, Monroeville, Pennsylvania</u>

Petitioner testified that he spent 146 hours in 2003, 164 hours in 2004, and 134.5 hours in 2005 meeting with contractors, reviewing bids, supervising renovations to this property, and trying to sell it.  Robert Goldie's invoices indicate, however, that it was he who met with a roofing contractor, had the contractor fix a leak, and discussed the leak with another individual.  Invoices from roofing contractors indicate that they corresponded with and billed Robert Goldie, not petitioner. There are no invoices in the record from any contractors other than these roofing contractors and Robert Goldie.

The parties have stipulated that during a 6-month period in 2003 petitioner "touched base via telephone" with his real estate agent every couple of weeks regarding the attempted sale of this property.  In 2005, petitioner considered a purchase offer that was contingent upon rezoning the property.  Petitioner testified that he met with attorneys that he had retained in July 2005 to pursue rezoning this property.  But apart from the engagement letter, the only evidence of interactions between the attorneys and petitioner is a check for $1,000 that petitioner paid them as a retainer.  Although petitioner has not expressly assigned any estimate of the time he might have spent in communicating with his real estate agent, lawyers, or potential buyers of this property, we are not persuaded that the hours petitioner spent in

these activities, or in any other activities relating to this property, remotely approach the hours that he has claimed.

### 3. 303 Forestwood Drive, Gibsonia, Pennsylvania

Petitioner testified that he spent 115 hours in 2003, 136 hours in 2004, and 140.5 hours in 2005 with respect to this property. Petitioner testified that he spent these hours performing upkeep and maintenance, making repairs, and attempting to sell the property. He testified that in 2005 he tore down a stone wall alongside the driveway on this property, piled the stones to be hauled away, and rebuilt the wall. But an invoice from Robert Goldie dated October 22, 2007, indicates not only that the wall was not repaired during the years at issue but also that it was Robert Goldie rather than petitioner who ultimately tore down the stone wall, hauled away the stone, and installed a new wall. In fact, although the record contains over 100 pages of documentary evidence about this property, none of it indicates repairs or improvements made to this property during the years at issue or suggests that petitioner performed any services with respect to this property or even visited it.

### 4. 516 Edgehill Drive, Gibsonia, Pennsylvania

Petitioner testified that he spent 115 hours in 2003, 136 hours in 2004, and 161 hours in 2005 discussing with a real estate agent the sale of this property and "cleaning up and doing small things, repairing baseboards and trying to clean it so it

would show better".  But the documents in the record suggest that it was petitioner's wife who was generally responsible for cleaning and maintaining this property and that in fact this maintenance had not occurred as of June 2005.[11]  The time petitioner's wife spent working on the property cannot be taken into account in determining whether petitioner was a real estate professional.  See sec. 469(c)(7)(B).

Petitioner also testified that he had contractors who worked on this property.  But petitioner never specifically identified these contractors or elaborated on his involvement with them.  The only invoices from contractors in the record indicate that the real estate agent coordinated with a plumbing contractor to test and repair the plumbing and that petitioner's involvement was limited to signing a proposal that was faxed to him and sending a check.

For 2004 and 2005 petitioner testified that he visited the property "As many hours as it took to accomplish that sale."  As previously noted, however, petitioner's calendar indicates no trips to Pennsylvania.  Moreover, the documents in the record indicate that petitioner generally received updates on the status and sale of the property from the real estate agent by telephone or fax to the bank or Batts Neck Plantation.  The documentary

---

[11]In a memorandum to his real estate agent dated June 14, 2005, petitioner complained about the condition of this property and stated that he hoped to be able to convince his wife that "a general clean up inside and out is mandatory."

evidence does not indicate any greater involvement on petitioner's part than reviewing the listing agreement and any offers and signing documents that were mailed to him. When the property was sold in 2005, the real estate agent signed the settlement documents on petitioner's behalf.

  5.  Kim Brett Drive, Allison Park, Pennsylvania

Petitioners claimed no deductions with respect to this vacant land. But petitioner testified that he spent 38.5 hours in 2003 subdividing this land and dealing with a homeowners association about problems arising from the subdivision. The documentary evidence does not substantiate that petitioner personally handled any such tasks. Petitioner testified that he also spent 5.5 hours in 2004 and 1 hour in 2005 receiving calls from individuals interested in purchasing lots, but he made no sales.

On brief petitioners do not contend that petitioner materially participated with respect to this property; rather, petitioners assert that because this was not a rental property it is "irrelevant" whether he materially participated. Petitioners are mistaken. In order to qualify as a real estate professional, a taxpayer must "[perform] more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates". Sec. 469(c)(7)(B)(ii) (emphasis added). We deem petitioners to have waived any

argument that petitioner materially participated with respect to this property.  Consequently, any hours that petitioner spent with respect to this property do not count toward the 750-hour requirement.

### 6.  Laurel Lane, Allison Park, Pennsylvania

Petitioners claimed no deduction with respect to this vacant land.  But petitioner testified that he spent 11 hours in 2003, 4.5 hours in 2004, and 1 hour in 2005 trying to sell this vacant land and having discussions with builders.  He also testified that he visited the property once in 2003 to see whether someone was parking cars there.  As with the other property just discussed, petitioners contend that it is "irrelevant" whether petitioner materially participated with respect to this property. We deem petitioners to have waived any argument that petitioner materially participated with respect to this property. Consequently, as just discussed, hours spent with respect to this property do not count toward the 750-hour requirement.

### B.  Petitioner's Miami, Florida, Properties

### 1.  770 N.E. 69th Street, Miami, Florida

Petitioner testified that he spent 117.5 hours in 2003 and 130.5 hours in 2004 visiting and doing work associated with this property.  The only specific activities petitioner testified to, however, were hiring a pest control company (Terminix), directing his bookkeeper to handle a dispute over the payment of

condominium association fees, and negotiating the sale with the purchaser's broker. A $59 Terminix bill does appear in the record. The documents in the record confirm that petitioner's bookkeeper handled the fees dispute. The record also strongly suggests that petitioner's wife was more directly involved in the transaction than petitioner, whose involvement appears to have been limited to communicating, from Maryland, with his wife and attorneys in Florida.[12] The time petitioner's wife spent handling the sale of the property, however, cannot be taken into account in determining whether petitioner was a real estate professional. See sec. 469(c)(7)(B). Petitioners ultimately appointed someone with a power of attorney to handle the sale for them. We are not persuaded that these various activities were nearly as time consuming for petitioner as his testimony would indicate.

2.  <u>15511 Fisher Island Drive, Miami, Florida</u>

Petitioner testified that he spent 22 hours in 2003, 32.5 hours in 2004, and 34 hours in 2005 managing this vacation rental property on Fisher Island Drive in Florida, including doing minor upgrades and corresponding with renters. Seemingly inconsistently, however, he also testified that he "didn't attempt to rent" the property during the years at issue.

---

[12]The record contains a letter, dated July 2, 2004, to petitioner from his wife complaining about petitioner's lack of responsiveness to communications about this property and urging him to cooperate.

Documentary evidence suggests that petitioner's wife may have handled some short-term rentals of the property during the years at issue, that petitioners' children and guests also stayed in the condominium, and that the property was refurbished in 2002. As previously stated, the time petitioner's wife spent with respect to the condominium cannot be taken into account in determining whether petitioner was a real estate professional. See sec. 469(c)(7)(B).

3. Condominiums at 1455 Ocean Drive, Miami, Florida

Petitioner testified that he spent 209 hours in 2003, 195.5 hours in 2004, and 318.5 hours in 2005 improving these two condominiums. On their joint Federal income tax returns petitioners claimed losses from these properties of $65,823 for 2003, $57,067 for 2004, and $62,169 for 2005. On brief petitioners concede that they are not entitled to these claimed losses because these were not rental properties and these expenses should have been capitalized rather than currently deducted. Petitioners contend, however, that hours petitioner spent on these properties during the years at issue should be counted toward the 750-hour requirement. As with certain other properties previously discussed, petitioners do not contend that petitioner materially participated with respect these properties; rather, they assert that it is "irrelevant" whether he materially participated. We deem petitioners to have waived any argument

that petitioner materially participated with respect to these properties. Consequently, as previously discussed, hours spent with respect to these properties do not count toward the 750-hour requirement.

In any event, we are not convinced that petitioner spent the number of hours claimed with respect to these properties during the years at issue. Petitioner testified that the units were refurbished during the years at issue, that he did some of the work himself, that he hired contractors to do some of the work, and that he decorated and furnished the units and marketed them for sale each year, although neither unit sold during the years at issue. But the hundreds of pages of exhibits relating to this property contain no evidence that improvements were made to these units during the years at issue. Rather, the record suggests that these properties, which petitioner purchased new in earlier years and never rented, were in no need of significant refurbishment.[13] The correspondence to and from petitioner regarding the sale of the unit that closed in 2006 show his address as being either at the bank in Maryland, Batts Neck Plantation, or unit 208 at Washington Harbour. This circumstance calls into question whether petitioner spent very much time personally tending to the marketing and sale of these properties.

---

[13]A handwritten memorandum dated Nov. 18, 2005, regarding the unit that was sold in 2006 indicates that no one had ever occupied the unit and that the appliances and beds had never been used.

C.  Batts Neck Plantation

Petitioner testified that he spent 72 hours in 2003, 8 hours in 2004, and 105 hours in 2005 working on this property.  He testified that he personally spent time renovating the barn, making hurricane-related repairs, and attempting to rent or sell the property.  Petitioner testified that he spent time meeting with contractors, assisting unspecified workers, and doing work on his own.  Specifically, petitioner testified that he installed new siding and shutters on the barn, "[jacked] the place up" to prepare for a new foundation for the barn, and made forms for the foundation footer.

Especially in the light of petitioner's age, health problems, and station in life, we question this testimony, which in any event is not corroborated by other evidence.  Neither of the two contractors who testified at trial observed petitioner doing any work on the property.  In fact, one contractor who had handled plumbing jobs at the property for many years, when asked if he had ever observed petitioner working at the property, testified that petitioner met him at the property only to review his progress and make sure they were "on the same page".  The other contractor, who spent about a month repairing the pier after a hurricane, testified that he never saw petitioner working on the property and that petitioner was not usually present at the property while he was there.  The contractor testified that

his interaction with petitioner consisted of three or four phone calls and three or four instances in which petitioner would show up to see his progress.

Petitioner testified that he advertised Batts Neck Plantation, showed the property, and talked to potential buyers or renters but that he "didn't get to the point where * * * [he] could sell it." The documentary evidence related to this property is contained in unorganized fashion in three-ring binders mixed in with receipts for shoes, clothing, jewelry, and restaurant meals. Petitioner does not direct our attention to, and we are unable to find, any copies of advertisements, listing agreements, or other evidence that petitioner ever listed the property for rent or sale or spent any substantial amount of time attempting to rent or sell the property.

Finally, although we do not address respondent's alternative argument that petitioner resided at Batts Neck Plantation during the years at issue--an issue as to which respondent would have the burden of proof, see supra note 8--we cannot ignore extensive evidence indicating that petitioner often stayed at Batts Neck Plantation during the years at issue. We believe that some of the hours petitioner claims with respect to this property were related to his stays there.

Petitioner also testified that he spent 10.5 hours in 2003, 7 hours in 2004, and 14 hours in 2005 with respect to the three

vacant lots that abutted Batts Neck Plantation.  He testified that he spent time talking with the owner of an adjoining property about selling the vacant lots and working to get approval for a septic tank.  As with other properties previously discussed, however, he does not contend that he materially participated with respect to these lots but instead asserts that it is "irrelevant" whether he materially participated with respect to these lots.  For the reasons previously discussed, we deem petitioners to have waived any argument that petitioner materially participated with respect to these vacant lots and consequently do not count these hours toward the 750-hour requirement.

D.  Washington Harbour Condominiums

Petitioner testified that he spent 298.5 hours in 2003, 485 hours in 2004, and 723.5 hours in 2005 working on this property, dealing with water damage and prosecuting his lawsuit against the condominium association.  To represent him in this litigation, petitioner hired three attorneys, two of whom testified at trial before this Court.  One of these attorneys testified that she spent "probably dozens of hours" between 2004 and 2008 working with petitioner on the litigation, although she could not state the specific number of hours she worked with him in either 2004 or 2005.  The other attorney testified that he billed petitioner for 20 to 30 hours in 2004 and for 60 to 80 hours in 2005 but

that only a portion of those hours was spent working with petitioner.

Petitioner testified that he spent time emptying buckets placed throughout the units to collect leaking water, covering furniture to protect it, mopping, and removing debris. Petitioner also testified that he met with the head of the condominium association construction committee, engineers, and the owner of another unit into which water was leaking from his units, and spoke with exterminators hired by the condominium association when he let them into his units. Petitioner testified that he visited the units to "[watch] things go on and make sure they did something about it". We are not convinced that petitioner spent several hundred hours each year engaged in the activities described.

Finally, as stated with respect to Batts Neck Plantation, although we do not address respondent's alternative argument that petitioner resided at Washington Harbour during the years at issue--an issue as to which respondent would have the burden of proof, see supra note 8--we cannot ignore extensive evidence indicating that petitioner often stayed there during the years at issue. We believe that some of the hours petitioner claims with respect to these properties were related to his stays there.

E. La Plata, Maryland Property

Before the years at issue, petitioner had owned an interest, through a partnership, in this single-family home. Petitioner testified that he spent 16 hours in 2003, 6 hours in 2004, and 15 hours in 2005 attempting to collect delinquent mortgage payments from the former tenant of this property and having conversations concerning the former tenant's lapsed insurance policy. On brief petitioners fail to make any argument with respect to this property. We deem them to have conceded the hours claimed with respect to this property.

V. Conclusion

Although petitioner spent some time dealing with his various properties during the years at issue and attempting to sell some of them, primarily through agents and brokers, we are not convinced that he performed more than 750 hours of services with respect to these properties during any year at issue. By 2003 petitioner had ceased to rent these properties to any significant extent and was looking to liquidate at least some of them. He was in ill health and had important duties at the bank. The properties were widely dispersed geographically. To a great extent he relied upon various agents, brokers, lawyers, and contractors as well as his wife, Robert Goldie, and Jeana Hopkins to deal with these properties.

Petitioners suggest that because petitioner owned so much real estate, which they say was worth over $30 million, he necessarily must have spent at least 750 hours each year managing these properties. Yet petitioner also testified that during the years at issue he spent only about 10 hours a month working at the bank. Considering that for most of this period he was both chairman of the board and CEO of the bank, with wide-ranging responsibilities and six-figure compensation, this testimony strains credibility. But if this testimony is to be believed, we see no reason to think that managing his mostly dormant real estate holdings would have required petitioner to spend anywhere near 750 hours each year. And if the testimony is not to be believed, petitioner's lack of credibility on this score further erodes his credibility about the hours he claims to have spent on his real estate activities.

We conclude and hold that petitioners have failed to establish that for any year at issue petitioner meets the 750-hour requirement to qualify as a real estate professional for purposes of section 469(c)(7).[14] Consequently, we sustain respondent's determination that the losses at issue are

---

[14]In the light of this holding, it is unnecessary to decide whether petitioner spent more than 50 percent of his time in real estate trades or businesses or whether he materially participated in them.

attributable to per se passive activities and are subject to the section 469 limitations.

<u>Decision will be entered for respondent</u>.